# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **RICKY LEE DEEL,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:14cv00009 |
| | ) | **MEMORANDUM  OPINION** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Ricky Lee Deel, ("Deel"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642

Case 2:14-cv-00009-PMS   Document 16   Filed 05/06/15   Page 1 of 29   Pageid#: 693

(4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Deel protectively filed his applications for SSI and DIB on December 14, 2010, alleging disability as of September 30, 2010, due to slow learning, neck, shoulder and liver problems, attention deficit disorder, bipolar disorder, nerves, depression, suicidal ideations, nausea, vomiting, body aches, rashes, fatigue, insomnia, inability to focus and withdrawal. (Record, ("R."), at 217-18, 225-28, 249, 253, 301, 320.) The claims were denied initially and upon reconsideration. (R. at 68-80, 81-93, 96-109, 110-23, 134-36, 140, 142-44, 145-47.) Deel then requested a hearing before an administrative law judge, ("ALJ"). (R. at 148-49.) A hearing was held on December 10, 2012, at which Deel was represented by a nonattorney representative. (R. at 31-67.)

By decision dated December 17, 2012, the ALJ denied Deel's claims. (R. at 14-25.) The ALJ found that Deel met the disability insured status requirements of the Act for DIB purposes through March 31, 2012. (R. at 16.) The ALJ found that Deel had not engaged in substantial gainful activity since September 30, 2010, the alleged onset date. (R. at 16.) The ALJ found that the medical evidence established that Deel had severe impairments, namely chronic liver disease; bipolar disorder; anxiety disorder; and learning disorder, but she found that Deel did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16-18.) The ALJ found that Deel had the residual functional capacity to perform simple,

routine, repetitive, unskilled medium work[1] and that Deel would do best in a work environment that did not require a great deal of social interaction.[2] (R. at 18.) The ALJ found that Deel had no past relevant work. (R. at 24.) Based on Deel's age, education, lack of work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Deel could perform, including jobs as a dishwasher, a laundry laborer and a dining room attendant. (R. at 24-25.) Thus, the ALJ concluded that Deel was not under a disability as defined by the Act and was not eligible for DIB or SSI benefits. (R. at 25.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2014).

After the ALJ issued her decision, Deel pursued his administrative appeals, (R. at 10), but the Appeals Council denied his request for review. (R. at 1-4.) Deel then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2014). This case is before this court on Deel's motion for summary judgment filed September 15, 2014, and the Commissioner's motion for summary judgment filed October 20, 2014.

---

[1] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2014).

[2] The ALJ placed a number of exertional limitations on Deel's work-related abilities. (R. at 18.) However, because Deel does not challenge the ALJ's findings with regard to his physical impairments, the undersigned will focus on the facts relevant to Deel's alleged mental impairments.

Case 2:14-cv-00009-PMS   Document 16   Filed 05/06/15   Page 3 of 29   Pageid#: 695

## II. Facts[3]

Deel was born in 1985, (R. at 217, 225), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He has a high school education and attended special education classes. (R. at 254.) He also has training in auto mechanics and as a heavy equipment operator. (R. at 254.) Deel has past work experience as a construction laborer and a telemarketer. (R. at 254.) Deel testified at his hearing that he previously had been awarded benefits based on "nerves," depression and bipolar disorder, but these were terminated in 2003 when he was incarcerated. (R. at 36.) He stopped working in September 2010 due to back, shoulder and neck pain, liver problems and fatigue. (R. at 37.) He stated that he had been diagnosed with Hepatitis C. (R. at 37.) Deel testified that he had seen a mental health counselor on several occasions, but he no longer was doing so because his insurance would pay for only so many sessions. (R. at 38.) He stated that he could not work because he had difficulty being around people, and he had much difficulty sleeping due to his mind racing, despite taking Trazodone, which only made him drowsy. (R. at 40, 43.) He stated that he had difficulty staying on task. (R. at 42.) Deel testified that he did not like to do anything, but preferred to stay at home. (R. at 43.) He stated that his wife did most of the cooking, cleaning and grocery shopping. (R. at 44.)

Deel testified that he had suffered with psychological problems for as long as he could remember, but it had worsened in the previous four to five years. (R.

---

[3] The relevant time period for determining disability in this case is from September 30, 2010, the alleged onset date, through December 17, 2012, the date of the ALJ's decision, for SSI purposes, and through March 31, 2012, the date last insured, for DIB purposes. Also, as previously stated, Deel challenges only the ALJ's findings with regard to his mental impairments. Thus, I will focus on the medical records pertinent thereto.

Case 2:14-cv-00009-PMS   Document 16   Filed 05/06/15   Page 4 of 29   Pageid#: 696

at 46.) He stated that his father committed suicide when he was 14 years old and that his older brother was killed only a couple of months later. (R. at 46.) He testified that he spent time in foster homes and a boys' home as a child, and he was hospitalized three times as a child for psychiatric issues. (R. at 46-47.) He stated that he experienced anxiety or panic and had nightmares about his father's death at least twice weekly. (R. at 50-51.) Deel testified that he would have difficulty using a computer due to trouble spelling and reading, as well as shoulder pain. (R. at 52.)

Deel's aunt, Sandra Coleman, also was present and testified at Deel's hearing. (R. at 53-60.) Coleman testified that she began taking care of Deel when he was 14 after his father committed suicide. (R. at 53.) She stated that he began receiving SSI benefits at that time. (R. at 60.) She stated that Deel was like her own child. (R. at 54.) Coleman stated that she helped him through school, noting that homework was "a struggle every night." (R. at 54.) Coleman testified that she made doctors' appointments for Deel, she made sure that he kept them, and she got progress reports from him. (R. at 54-55.) She stated that she attended these appointments with him until he moved away the previous year. (R. at 54.) Coleman testified that she did "everything" in relation to filing his disability claims, noting that Deel never filled out any of his own paperwork. (R. at 57.) She stated that he could not understand correspondence from the Social Security Administration. (R. at 57.) Coleman testified that Deel had seen Tina Compton, a nurse practitioner, off and on for his anxiety and bipolar disorder since 2003, which was treated with medication. (R. at 59.) According to Coleman, her mother gained custody of Deel in 2002. (R. at 60.)

Barbara Byers, a vocational expert, also was present and testified at Deel's hearing. (R. at 61-64.) She classified his past work as a construction laborer as

heavy[4] and unskilled and as a telemarketer as sedentary[5] and semi-skilled.  (R. at 61.)  Byers testified that a hypothetical individual of Deel's age, education and past work history who suffered from fatigue, limiting him to simple, repetitive, routine medium work with no more than occasional climbing of ladders, scaffolds or ropes and occasional balancing, frequent climbing of stairs and ramps, frequent stooping, kneeling, crouching and crawling and who would do best with work not requiring a great deal of social interaction, could not perform any of Deel's past work.  (R. at 61-62.)  However, Byers testified that such an individual could perform other jobs existing in significant numbers in the national economy, including jobs as a dishwasher, a laundry laborer and a dining room attendant.  (R. at 62.)  Byers next testified that the same hypothetical individual, but who could only occasionally interact with co-workers and the public, also could perform the jobs enumerated.  (R. at 62-63.)  Byers testified that if an individual were off task 10 to 15 percent of the day as a result of requiring additional supervision and difficulty interacting with co-workers and/or the public and also due to dealing with the usual stressors in competitive work, he could not perform competitive work if such limitations continued on a regular basis over time.  (R. at 64.)  Byers also testified that if an individual were tardy or absent two days monthly, he could not sustain competitive employment.  (R. at 64.)

---

[4] Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds. If someone can perform heavy work, he also can perform medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2014).

[5] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying items like docket files, ledgers and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2014).

Case 2:14-cv-00009-PMS   Document 16   Filed 05/06/15   Page 6 of 29   Pageid#: 698

In rendering her decision, the ALJ reviewed records from Wellmont Bristol Regional Medical Center; Cumberland Mountain Community Services; Hurley Family Health Center; Clinch Valley Medical Center; Mountaineer Gastroenterology; Tonya McFadden, Ph.D., a licensed psychologist; Buchanan General Hospital; The Clinic; Carilion Clinic; New River Valley Community Services; Academy Primary Care Associates; Stone Mountain Health Services; The Center for Emotional Care;  and Tina Compton, F.N.P., a family nurse practitioner.  Deel's attorney submitted additional medical records from B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, to the Appeals Council.[6]

The record shows that Deel was hospitalized for psychiatric treatment at Wellmont Bristol Regional Medical Center, ("Wellmont"), as far back as February 2000 for approximately two weeks, and again just a week later for approximately one week.  (R. at 359-70.) On both occasions, Deel was hospitalized for attempted suicide.  (R. at 359-70.)  He admitted stress and anxiety related to his father's suicide, his brother's death and his removal from his stepmother's care and placement into a group home.  (R. at 367.)  Upon admission on February 24, 2000, Deel was diagnosed with major depression, recurrent, severe, without psychotic features; rule out dysthymia; rule out adjustment disorder with disturbance of emotions and conduct; and his then-current Global Assessment of Functioning, ("GAF"),[7] score was assessed at 30.[8]  (R. at 367-69.)  He was prescribed

---

[6] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 1-4), this court also must take this evidence into account when determining whether substantial evidence supports the ALJ's findings.  *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

[7] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

Case 2:14-cv-00009-PMS   Document 16   Filed 05/06/15   Page 7 of 29   Pageid#: 699

medications, and counseling was initiated. (R. at 369.) Upon discharge on March 8, 2000, Deel was diagnosed with major depression, recurrent, severe without psychotic features; differential diagnosis dysthymia; and a GAF score of 50.[9] (R. at 364.) Deel was readmitted to Wellmont approximately one week later after attempting suicide by overdosing on Risperdal after a difference of opinion between him and the caseworker at his group home regarding his return home. (R. at 361.) He was diagnosed with dysthymia; differential diagnosis of major depression, recurrent, severe, without psychotic features; and a then-current GAF score of 35.[10] (R. at 363.) Deel again was treated with medications and counseling. (R. at 363.) It was noted that Deel had intense group therapy, in which he participated much more appropriately than his previous hospitalization. (R. at 360.) Upon discharge on March 22, 2000, he was scheduled for continued counseling and advised to continue care with a physician for continued medication monitoring. (R. at 360.)

The record contains notes from counseling that Deel attended at Cumberland Mountain Community Services, ("Cumberland Mountain"), from October 2, 2007, through April 13, 2009. (R. at 372-400.) On October 2, 2007, Deel was referred to Cumberland Mountain for the Adult Moral Reconation Therapy, ("MRT"), Program by the Appalachian Detention Center, while incarcerated. (R. at 387-97.)

---

[8] A GAF score of 21 to 30 indicates "[b]ehavior [that] is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment … OR inability to function in almost all areas. …" DSM-IV at 32.

[9] A GAF score of 41 to 50 indicates "[s]erious symptoms … OR any serious impairment in social, occupational, or school functioning. …" DSM-IV at 32.

[10] A GAF score of 31 to 40 indicates "[s]ome impairment in reality testing or communication … OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. …" DSM-IV at 32.

He admitted to a history of substance abuse, including Oxycontin, Lorcet and Methadone. (R. at 389.) Deel was cooperative, but with a depressed mood, appropriate affect, restless motor activity, goal-oriented thought form, moderate insomnia, increased appetite, decreased energy level, mild irritability/anger; moderate crying spells, no hallucinations or delusions, no then-current suicidal or homicidal ideations, intact orientation, memory and concentration and good insight and judgment. (R. at 395.) Deel was diagnosed with opioid abuse; sedative, hypnotic or anxiolytic abuse; and alcohol abuse; and his then-current GAF score was placed at 62. (R. at 372.) From October 15, 2007, through February 20, 2008, treatment notes reflect that Deel's orientation and thought processes were intact, he had no paranoia/delusions, and his judgment and insight were fair. (R. at 373-75, 380-86.) Upon completion of the MRT program on February 20, 2008, his GAF score was assessed at 70.[11] (R. at 400.)

Deel was seen at Hurley Family Health Center from September 29, 2010, through October 18, 2010, for various complaints. (R. at 405-13, 565-73.) On October 18, 2010, Deel was oriented with a normal mood and affect. (R. at 406, 572.) He endorsed no depression or anxiety over this treatment period. (R. at 405, 408, 570, 573.) When Deel presented to the emergency department at Clinch Valley Medical Center on October 19, 2010, due to elevated liver enzymes, he endorsed no psychiatric symptoms, and on physical examination, Deel's psychiatric status was deemed normal. (R. at 419-20.)

---

[11] A GAF score of 61 to 70 indicates "[s]ome mild symptoms … OR some difficulty in social, occupational, or school functioning … but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

Case 2:14-cv-00009-PMS   Document 16   Filed 05/06/15   Page 9 of 29   Pageid#: 701

Deel saw Tonya McFadden, Ph.D., a licensed psychologist, for a consultative psychological evaluation at the request of the State Agency, on March 21, 2011. (R. at 439-45.) Deel reported previously receiving disability benefits, which were discontinued due to incarceration for a probation violation. (R. at 439, 442.) He reported feeling depressed at least a few hours daily. (R. at 440.) He reported sleeping only about three hours nightly, feeling "drained," experiencing mood changes, low self-esteem, feelings of inadequacy and periods of being talkative, having racing thoughts and being more goal-directed. (R. at 440.) Deel further reported feeling nervous and not liking to be around a lot of people. (R. at 440.) He reported a previous attention deficit disorder, ("ADD"), diagnosis and continued difficulty sustaining attention and being easily distracted. (R. at 440.) He also admitted to ongoing difficulties completing tasks, an inability to sit still, losing things often and forgetfulness. (R. at 440.) Deel stated that he then-currently lived with his grandmother and that his girlfriend stayed with him. (R. at 441.) He stated that he watched television, worked on his vehicle and picked up around the house. (R. at 441.) He further stated that he had regular contact with his aunt, who lived across the street. (R. at 441.) Deel reported going to the store and eating out at least once weekly. (R. at 441.)

Deel admitted to prior Oxycontin abuse and substance abuse treatment. (R. at 441.) He stated that he was retained in the seventh grade, and he often was disciplined due to misbehavior. (R. at 441.) Deel reported that he began psychiatric treatment at the age of 14, when he was hospitalized and started on medications. (R. at 442.) He further reported that he had been treated at Cumberland Mountain and had been prescribed medications by his regular physician. (R. at 442.) Deel stated that he was again hospitalized at Marion State Hospital at the age of 15 for

five days.[12] (R. at 442.) He reported that he was not then-currently taking any medications. (R. at 442.)

According to McFadden, Deel was pleasant and cooperative during the evaluation, and his speech was relevant and coherent and delivered with normal tone and rhythm. (R. at 443.) There was no evidence of distorted thought processes, delusions or hallucinations, and no marked mood disturbance was present. (R. at 443.) Deel's affect was appropriate, and he denied suicidal or homicidal ideation. (R. at 443.) He was alert and oriented, judgment was fair, immediate memory was normative, recent and remote memory was intact, and concentration was mildly impaired. (R. at 443.) McFadden administered the Wechsler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), on which Deel obtained a verbal comprehension index score of 86, a perceptual reasoning index score of 102, a working memory index score of 86, a processing speed index score of 92 and a full-scale IQ score of 86. (R. at 443.) McFadden deemed these scores valid because Deel appeared to put forth his best effort, he followed directions without apparent difficulties, and there was no need to repeat directions. (R. at 444.) McFadden noted that these scores also were consistent with Deel's reported educational and vocational background. (R. at 444.) She diagnosed Deel with bipolar disorder, not otherwise specified; anxiety disorder, not otherwise specified; attention deficit/hyperactivity disorder, ("ADHD"), not otherwise specified; and learning disability (provisional pending review of achievement testing); and she placed his then-current GAF score at 55.[13] (R. at 444-45.) She deemed his prognosis as fair with sustained treatment. (R. at 445.) McFadden concluded that

---

[12] There are no treatment records from Marion State Hospital contained in the record.

[13] A GAF score of 51 to 60 indicates "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning. …" DSM-IV at 32.

Deel would have some difficulties with repetitive and simple tasks that may require additional supervision and that it was likely he would have difficulties attempting detailed and complex tasks. (R. at 445.) She further concluded that Deel may have difficulties interacting with co-workers and with the public and that he was likely to have difficulties dealing with the usual stressors encountered in competitive work. (R. at 445.)

Patricia Bruner, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on April 12, 2011, in connection with Deel's initial claim denial. (R. at 73-74.) Bruner found that Deel was moderately restricted in his activities of daily living, experienced moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation of extended duration. (R. at 74.) Bruner also completed a Mental Residual Functional Capacity Assessment, finding that Deel was moderately limited in his ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with or in proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. (R. at 76-78.) She found that Deel was markedly limited

in his ability to understand and remember detailed instructions. (R. at 77.) It was concluded that, despite a diagnosed mental disorder, Deel retained the ability to remember, understand and communicate with others, and while his condition prevented him from performing some types of work activity, the evidence showed that he had the ability to perform a wide range of routine work. (R. at 80.) Another PRTF was completed by Jo McClain, PC, another state agency source, on August 22, 2011, in connection with the reconsideration of Deel's claims. (R. at 101-02.) McClain's findings echoed those of Bruner. (R. at 102.) McClain also completed a Mental Residual Functional Capacity Assessment, again making the same findings as Bruner. (R. at 105-06.) It was concluded that, despite some difficulty learning detailed and complex information, Deel retained the ability to learn many new things and perform a wide variety of tasks, and, while he was upset about his conditions, they had not affected his ability to understand, remember and cooperate with others or perform normal daily activities. (R. at 108.)

On August 13, 2011, Deel saw Dr. David Boone, D.O., for a consultative physical examination, at the request of the State Agency. (R. at 458-63.) Dr. Boone noted Deel's past diagnosis of bipolar disorder and further stated that he had been off of all medications for the previous two years. (R. at 459.) Deel denied suicidal or homicidal ideation, and he stated he mostly kept to himself. (R. at 459.) He stated that he had a temper and quickly became annoyed with people. (R. at 459.) However, he stated that he was not a violent person, so he simply withdrew instead of acting on his emotions. (R. at 459.) Deel reported that he was able to drive, could shower and bathe and helped out with household chores. (R. at 459.) Deel endorsed nervousness, anhedonia and depression. (R. at 460.) His mood and affect were appropriate, he had a linear thought process, was able to maintain eye contact throughout the exam and was able to follow complex directions appropriately

without the need for multiple cues. (R. at 460.) Among other things, Dr. Boone diagnosed a subjective history of psychiatric disorders; and a subjective history of ADD, suboptimally controlled off medication; as well as his other psychiatric illnesses, but he subjectively appeared improved due to being in a better marriage. (R. at 462.)

Deel saw Tina Compton, FNP, on September 16, 2011, at which time she noted that he had not been seen since 2007. (R. at 581.) In a review of systems, Deel endorsed anxiety, bipolar disorder and irritability. (R. at 581.) He was diagnosed with anxiety and depression, among other things, and Compton prescribed Zoloft and fluoxetine. (R. at 581.) Deel saw Compton on October 13 and December 3, 2011, with complaints of anxiety and depression. (R. at 579-80.) Deel reported that Zoloft made him more depressed, and Compton prescribed Cymbalta on December 3, 2011. (R. at 579-80.) She noted that Deel needed a referral to mental health services. (R. at 579.)

Deel began seeing Dr. Raymond Pate, D.O., at Academy Primary Care Associates, ("Academy"), on December 20, 2011. (R. at 559-61.) At that time, Deel's main complaint was depression, which had been associated with suicidal thoughts. (R. at 560.) He denied making a plan, and he denied having weapons at home. (R. at 560.) Deel endorsed depression, anxiety and suicidal ideation for the previous six months. (R. at 560.) He was able to articulate well with normal speech/language, rate, volume and coherence, he displayed good eye contact, and his mood was euthymic with a full affect. (R. at 561.) Dr. Pate diagnosed depressive disorder, recurrent, in partial remission, and he prescribed Cymbalta. (R. at 561.)

Deel saw Molly Sharp, PA-C, at The Center for Emotional Care, for initial intake on October 18, 2012. (R. at 574-78.) Deel reported that he felt down and tired all the time and that Wellbutrin made him feel like a "zombie." (R. at 574.) He stated that Adderal had kept him more alert and focused in the past. (R. at 574.) He reported increased energy and difficulty with racing thoughts a couple of nights weekly, as well as constant worry. (R. at 574.) His mood was depressed and overwhelmed. (R. at 574.) Deel reported a poor appetite and anxiety. (R. at 574.) Deel's eye contact was fair, he was fidgety with his hands, impulse control appeared fair, speech was coherent and fluent, his mood was dysthymic with congruent affect, thought process was linear, and insight, judgment and reliability were fair. (R. at 576-77.) Deel denied suicidal or homicidal intent, plan or gestures, as well as depersonalization/derealization. (R. at 577.) He was alert and fully oriented, and his fund of knowledge was deemed average based on his vocabulary. (R. at 577.) Test scores were as follows: Beck Depression Inventory: 23; Mood Disorder Questionnaire: 5; #2 no; #3 moderate problem; Beck Anxiety Inventory: mild; and Michigan Alcohol Screening Test: no. (R. at 577.) Sharp diagnosed depressive disorder, not elsewhere classified; anxiety state, unspecified; persistent disorder of initiating or maintaining sleep; rule out bipolar I disorder, most recent episode (or current) depressed, unspecified; history of opiate dependence in remission; and ADD and bipolar disorder, by report. (R. at 578.) His then-current GAF score was assessed at 45 to 50. (R. at 578.) Deel was continued on Wellbutrin, he was prescribed Trazodone, and he was encouraged to see an outpatient counselor. (R. at 577.)

Deel returned to Academy on December 27, 2011, and January 10, 2012. (R. at 553-54, 557-58.) He continued to complain of depression and anxiety. (R. at 553, 557.) On December 27, 2011, his Cymbalta dosage was reduced due to

nausea and vomiting, and he was prescribed Wellbutrin. (R. at 557-58.) Deel denied suicidal ideation over this period. (R. at 553, 557.) On January 10, 2012, Deel's thought content was normal, and he could perform basic computations and apply abstract reasoning. (R. at 554.) He was fully oriented. (R. at 554.) Dr. Pate diagnosed depressive disorder, recurrent, in partial remission, and he continued Deel on Cymbalta and Wellbutrin. (R. at 554.)

Deel received mental health treatment at New River Valley Community Services, ("New River Valley"), from February 7, 2012, through May 1, 2012. (R. at 505-25.) At the initial assessment on February 7, 2012, Deel rated his anxiety as a 6/10 and his depression as a 5-7/10. (R. at 517.) He denied then-current suicidal ideations, but noted that this was easily triggered by relational conflict with his wife. (R. at 517.) Deel reported thinking of plans usually involving a gun, to which he had no access. (R. at 517.) He denied homicidal ideations and hallucinations. (R. at 517.) Deel reported feeling alone and "left out," irritable, withdrawing, anhedonia, lack of motivation, suicidal ideation, unstable mood and losing control when angered or hurt. (R. at 517.) He noted depressive symptoms that lasted for numerous weeks at a time, and he reported compulsions, such as needing things to be in their proper places and doing things in a specific pattern, behaviors over which he had no control and was unable to ignore. (R. at 517.) Lisa Buonomano, MS, MSW, noted that Deel was able to maintain eye contact, he had a blunted affect and appeared slightly nervous. (R. at 517.) He was alert and oriented with no delusions or paranoia. (R. at 517.) Deel reported several past suicide attempts, two psychiatric hospitalizations and a history of substance abuse. (R. at 517.) After this initial assessment, Buonomano diagnosed Deel with major depressive disorder, recurrent; generalized anxiety disorder; and obsessive compulsive disorder; and she placed his then-current GAF score at 50. (R. at 518-19.) Deel continued to see

Buonomano through March 1, 2012. (R. at 514-16.) Over this time, he denied suicidal ideation. (R. at 514, 516.) He did report paranoid symptoms, including needing to lock the doors because he was afraid people would "get [him]" or kill him. (R. at 516.) On March 1, 2012, Deel reported manic symptoms, including restlessness, decreased sleep, increased energy, increased anxiety and pressured speech. (R. at 514.) Buonomano found that Deel met the criteria for bipolar II disorder. (R. at 514.) She encouraged him to continue with additional services. (R. at 514.)

On March 8, 2012, Deel returned to Academy, reporting that he had completed counseling with New River Valley and was waiting for psychiatry for an assessment for possible bipolar disorder. (R. at 551.) He reported that Wellbutrin no longer helped, but denied suicidal ideation and planning. (R. at 551.) Mental status examination revealed that Deel was able to articulate well with normal speech/language, rate, volume and coherence, he was fully oriented, his mood was euthymic, and his affect was full. (R. at 552.) He was diagnosed with depressive disorder, not elsewhere classified, and Dr. Peter L. Reynolds, M.D., noted that Deel needed to see a psychiatrist as planned for possible bipolar disorder. (R. at 552.) Deel was instructed to continue Cymbalta, and his dosage of Wellbutrin was increased. (R. at 552.)

On March 7, 2012, Buonomano diagnosed Deel with bipolar II disorder; generalized anxiety disorder; and obsessive compulsive disorder; and she placed his then-current GAF score at 50. (R. at 519.) Deel returned to New River Valley on April 11, 2012, inquiring about the requested referral to a psychiatrist, noting that he was unable to receive the necessary Hepatitis treatment without approval from a psychiatrist. (R. at 512.) Buonomano assured Deel that she would check

into the referral, but advised that the waiting list appeared to be longer than usual. (R. at 512.) She also reminded Deel that he must follow up with additional services, and requested that an intake appointment be scheduled. (R. at 512.)

When Deel saw Dr. Marrieth Rubio, M.D., with Carilion Clinic – Gastroenterology, on March 28, 2012, he noted that he was taking Cymbalta and Wellbutrin. (R. at 494-99.) However, a review of symptoms was negative for depression, suicidal ideas, hallucinations, memory loss and substance abuse. (R. at 495-96.) Deel did endorse insomnia, but it was noted that he was not anxious or nervous. (R. at 496.) Upon physical examination, he was fully oriented and in no acute distress, and his mood, memory, affect and judgment were deemed normal. (R. at 496.) Deel was diagnosed with Hepatitis C, chronic; elevated LFTs; and depression. (R. at 496, 499.) Dr. Rubio noted that Deel had an appointment for a counselor, and he had been asked to request clearance for treatment for the Hepatitis C. (R. at 497.)

Deel saw Dr. Holli Waller, D.O., at Academy, on April 17 and April 25, 2012, for follow-up and medication adjustments. (R. at 545-50.) Deel complained of continued depression, anxiety, inability to concentrate, mood changes and insomnia. (R. at 546, 548.) He denied suicidal ideation or planning. (R. at 546, 549.) On April 17, 2012, Dr. Waller restarted Deel on Wellbutrin. (R. at 549.) On April 25, 2012, Deel's mood and affect were anxious, and Dr. Waller diagnosed bipolar I disorder, most recent episode manic, severe. (R. at 546.) Dr. Waller doubled Deel's Wellbutrin dosage and prescribed Vistaril for insomnia. (R. at 546.) He still was awaiting a psychiatry appointment. (R. at 546.)

Deel attended an orientation appointment with Karen Kreutzberg, MS, MT-BC, at New River Valley, on April 23, 2012. (R. at 509.) He denied suicidal or homicidal ideation, plan or intent, and he was scheduled for intake with Vicki Wells, LPC, a licensed professional counselor, on May 1, 2012. (R. at 509.) When Deel saw Wells on May 1, 2012, he reported anxiety over an upcoming legal hearing. (R. at 506-07.) Deel reported mood swings, irritability, self-isolation, sadness and tearfulness, anxiety, racing thoughts, insomnia, surging energy preventing rest, varying appetite resulting in frequent weight changes and feeling overwhelmed. (R. at 506.) He denied suicidal or homicidal ideations. (R. at 506.) Deel's affect was highly anxious throughout the intake, but thought content was devoid of any suicidal or homicidal ideation. (R. at 507.) No hallucinations or delusional constructs were noted, and his thought process overall was clear and linear without any evidence of a formal thought disorder. (R. at 507.) Deel's speech overall was normal in rate, tone and volume, and he was oriented to person, place, time and situation. (R. at 507.) A needs assessment revealed Deel's desire to remain on the agency psych list. (R. at 507.) Wells diagnosed Deel with bipolar II disorder; generalized anxiety disorder; and obsessive compulsive disorder; and she placed his then-current GAF score at 56. (R. at 505.)

Deel returned to Dr. Waller from May 10 through August 24, 2012. (R. at 527-44.) Over this time, Deel complained of insomnia, depression and anxiety, among other things. (R. at 540-41, 543-44.) He denied suicidal ideation. (R. at 541, 543.) Deel reported that no medications had helped his insomnia. (R. at 543.) On May 10, 2012, Deel was fully oriented with an appropriate mood and affect, and he demonstrated appropriate insight and judgment. (R. at 544.) On June 6, 2012, Deel reported that Vistaril did not help him sleep, but that he was doing "ok" on Wellbutrin. (R. at 540.) He was again fully oriented with an appropriate mood and

affect. (R. at 541.) Dr. Waller diagnosed bipolar I disorder, most recent episode manic, severe, and she continued Deel on Wellbutrin. (R. at 541.) She also prescribed Flexeril. (R. at 541.) On August 3, 2012, Deel's mood and affect were full range. (R. at 531.) On August 24, 2012, Deel reported that he remained on a waiting list to see a psychiatrist. (R. at 527.) Dr. Waller diagnosed bipolar disorder, unspecified, and referred Deel to the Center for Emotional Care. (R. at 528.)

Deel saw B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, for a consultative psychological evaluation, at the request of counsel, on March 1, 2013. (R. at 597-607.) Academic records indicated that he used special education services throughout his schooling and was retained in the eighth grade. (R. at 599.) Lanthorn noted the testing scores obtained by McFadden in March 2011, as well as her diagnoses of Deel. (R. at 601.) Deel reported that he did not feel like doing anything and mostly "[sat] around the house." (R. at 601.) He indicated that his wife performed most of the laundry, cooking, cleaning and shopping. (R. at 601.) Deel stated that he no longer attended church, he socialized with his wife and children, and he watched television, but rarely read. (R. at 601.)

On mental status evaluation, Deel's speech was clear and intelligible, he made adequate eye contact, and rapport was readily established and maintained. (R. at 602.) He appeared highly anxious and tense throughout the examination, and he was "very fidgety." (R. at 602.) Nonetheless, Deel was able to persist at testing tasks and concentrate, at least, adequately. (R. at 602.) Deel exhibited no signs of ongoing psychotic processes or any evidence of delusional thinking, and he denied hallucinations. (R. at 602.) He stated that being around crowds caused him anxiety. (R. at 602.) Deel reported that he first became depressed when his father died. (R. at 602.) He stated that he was psychiatrically hospitalized at the age of 14, and that

he had attempted suicide five times, the last of which was in 2009. (R. at 602.) Deel reported that he had attempted to shoot himself, but was stopped from doing so. (R. at 602.) He stated that his anti-depressant medication "kind of help[ed]," but he rated his then-current depression at 7/10. (R. at 602.) He reported preferring to be alone most of the time, even withdrawing from his wife. (R. at 602.) Deel admitted often being irritable and grouchy, being difficult to be around and having rapid mood swings. (R. at 602.) He acknowledged some suicidal ideation, without plan or intent. (R. at 602.) With regard to symptoms of possible mania, Deel reported that he had periods of time where he could not sit still and was restless, becoming agitated and hyperactive. (R. at 603.) He denied episodes of an elevated or inflated degree of self-esteem or grandiose thinking or of becoming over-talkative. (R. at 603.) He acknowledged racing thoughts at times, in which he went over and over things. (R. at 603.) Deel further reported often feeling anxious, on edge and jittery at times. (R. at 603.) He admitted having panic attacks, in which he had difficulty breathing. (R. at 603.) Deel stated that his ability to focus his attention was not particularly good, but stated that he got "bored real easily." (R. at 603.) He reported that he was forgetful sometimes and that he was quite organized, and everything needed to be "just a certain way." (R. at 603.) Lanthorn noted that Deel was anxious, but did not appear to be overactive in his chair or fidgety in any major way. (R. at 603.)

Lanthorn administered the Wechsler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), on which Deel obtained a full-scale IQ score of 61, placing him in the extremely low range of intellectual functioning. (R. at 603.) Lanthorn contrasted this score with the one obtained in 2011, which was 25 points higher overall. (R. at 604.) Deel earned a verbal comprehension scale index of 70, placing him in the borderline range, a perceptual reasoning index score of 71, placing him

in the borderline range, a working memory index score of 71, placing him in the borderline range, and a processing speed index score of 61, placing him in the extremely low range. (R. at 604.) However, Lanthorn opined that Deel gave a less than full effort on the test, which was dramatically illustrated on the processing speed index score,[14] and he further opined that Deel quite probably was functioning in the borderline to low average range intellectually. (R. at 604.) Lanthorn also administered the Minnesota Multiphasic Personality Inventory – 2, ("MMPI-2"). (R. at 605.) He stated that Deel appeared to have responded in a random or unselected manner to items toward the end of the test, and other validity scales indicated that his profile must be interpreted with caution because it may well be invalid for a variety of reasons, including an inability to understand the test or testing items, which seemed unlikely, or a distortion due to exaggeration of the severity of psychopathology. (R. at 605.) Testing indicated that Deel may be experiencing moderate levels of emotional distress characterized by dysphoria and anehdonia, and he also may have anxiety, depression and become easily agitated. (R. at 606.)

Lanthorn diagnosed Deel with major depressive disorder, recurrent, moderate; generalized anxiety disorder; opioid dependence in sustained full remission; rule out somatization disorder, not otherwise specified; rule out bipolar disorder, not otherwise specified (by history); personality disorder, not otherwise specified; and borderline intellectual functioning; and he placed his then-current GAF score at 61. (R. at 606-07.) He deemed Deel's allegations of psychologically disabling conditions to be partially credible. (R. at 607.) He recommended that Deel strongly consider seeking outpatient psychotherapeutic and psychiatric

_____

[14] Lanthorn stated that on this test, Deel scored almost as low as could possibly be scored on two pencil and paper tasks, on which he appeared to work very slowly. (R. at 603.)

intervention. (R. at 607.) Lanthorn concluded that Deel was capable of understanding simple tasks in the workplace, but routine, complicated tasks would present mild to great limitations. (R. at 607.) He found that Deel would be mildly to moderately limited in his ability to interact with the general public, with supervisors and with co-workers and that he would be mildly limited in his ability to deal with change and the requirements of the workplace. (R. at 607.) Lanthorn found that Deel would be mildly limited in his ability to sustain concentration and persist at tasks. (R. at 607.)

Lanthorn also completed a Work Capacity Evaluation (Mental), finding that Deel was slightly[15] limited in his abilities to make simple work-related decisions, to be aware of normal hazards and take appropriate precautions and to travel in unfamiliar places or use public transportation. (R. at 608-10.) He found that Deel was moderately[16] limited in his abilities to remember locations and work-like procedures, to sustain an ordinary routine without special supervision, to work in coordination with or in proximity to others without being distracted by them, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness and to set realistic goals or make plans independently of others. (R. at 608-10.)

---

[15] The evaluation defines a slight limitation as "[s]ome mild limitation in this area, but generally functions pretty well." (R. at 608.)

[16] The evaluation defines a moderate limitation as "[m]ore than slight but less than marked." (R. at 608.)

Lanthorn found that Deel was markedly[17] limited in his abilities to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods and to respond appropriately to changes in the work setting. (R. at 608, 610.) Lanthorn found that Deel was between moderately and markedly limited in his ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances. (R. at 609.) Lanthorn based these limitations on the diagnoses he imposed on Deel. (R. at 608.) Lanthorn stated that it was "unclear" as to the earliest date these limitations could have been present, and he rated Deel's prognosis as fair. (R. at 610.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2014). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2014).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the

---

[17] The evaluation defines a marked limitation as "[s]erious limitations in this area. The ability to function is this are[a] is severely limited but not precluded." (R. at 608.)

Case 2:14-cv-00009-PMS   Document 16   Filed 05/06/15   Page 24 of 29   Pageid#: 716

claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011 & West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

The ALJ found that Deel had the residual functional capacity to perform simple, routine, repetitive, unskilled medium work that did not require a great deal of social interaction. (R. at 18.) In his brief, Deel argues that the ALJ erred by finding that his mental impairments did not meet the criteria for § 12.05C, the listing for intellectual disability. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 9-12.) Deel also argues that the evidence submitted to the Appeals Council warrants a remand pursuant to sentence six. (Plaintiff's Brief at 12-15.) For the reasons that follow, I find that substantial evidence exists to support the ALJ's finding that Deel's mental impairments did not meet the criteria for § 12.05C. Deel does not challenge the ALJ's findings with regard to his physical residual functional capacity.

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must

consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Listing § 12.05, the listing for intellectual disability,[18] states that intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (2014). Here, Deel argues that his impairments meet the required level of severity of this disorder by meeting the criteria set forth in § 12.05C.[19] Listing § 12.05C requires a "valid verbal, performance, or full-scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C (2014). Therefore, alongside the two requirements in § 12.05C, the introductory paragraph of § 12.05 creates an additional element required to meet the listing for intellectual disability, creating a three-part test for the listing. *See Smith v. Barnhart*, 2005 WL 823751, at *14 (W.D. Va. Apr. 8, 2005) (citing *Barnes v. Barnhart*, 2004 WL 2681465, at *4 (10th Cir. 2004)). Additionally, the introductory paragraph makes clear that intellectual disability is a lifelong, not an acquired, disability. *See Smith*, 2005 WL 823751, at *14. Thus, to qualify as disabled under this listing, a claimant must demonstrate that he has had deficits in adaptive functioning that began during

---

[18] Effective August 1, 2013, the Social Security Administration promulgated a final rule substituting the term "mental retardation" with "intellectual disability." *See* Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed. Reg. 46,499 (Aug. 1, 2013). The substance of the listing, including the criteria, remains unchanged.

[19] A claimant may establish the requisite level of severity for the listing for intellectual disability when the requirements in § 12.05A, B, C or D are satisfied. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

childhood and also demonstrate that he meets the IQ requirement and has a physical or other mental impairment imposing an additional and significant work-related limitation of function. *See Smith*, 2005 WL 823751, at *14; *see also* 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3) (2014).

With regard to the IQ prong, Deel argues that in September 2003, when he was 18 years old, he was administered the Wechsler Adult Intelligence Scale – Third Edition, ("WAIS-III"), on which he received a verbal IQ score of 77, a performance IQ score of 68 and a full-scale IQ score of 70. While the record does not contain the actual test results or any accompanying psychological report, these scores are referenced in a March 30, 2004, Disability Hearing Officer's Decision. (R. at 127.) It appears that Deel's child's benefits had been terminated based on age, and this hearing was held to determine whether he met the adult disability standards. The disability hearing officer concluded that Deel suffered from mild mental retardation, as evidenced by the performance IQ score of 68. (R. at 127.) This decision stated: "The claimant has mild mental retardation with significant anxiety and depression. It is concluded that the claimant meets adult listing § 12.05C." (R. at 129.) In a Summary of Evidence attached to the decision listing the evidence considered by the disability hearing officer, there are three medical records dated September 2003, including a PRTF, a mental residual functional capacity assessment and a consultative examination by B. Wayne Lanthorn. (R. at 132.) The hearing officer did not specify which records contained the relied-upon intelligence testing.

In her decision, the ALJ stated that she was rejecting these prior IQ scores because the report of the mental exam and IQ testing was not in evidence before her and because the hearing officer's decision did not state whether the IQ scores

were considered valid. (R. at 18.) The ALJ further stated that a comparison of these prior scores to more recent testing raised questions as to their validity and might be an underestimate of Deel's intellectual functioning. (R. at 18.) In particular, the ALJ emphasized that in 2011 Deel achieved a full-scale IQ score of 86, which was deemed valid by the testing administrator, psychologist McFadden, as it was consistent with Deel's vocational background and educational history. (R. at 18.) The ALJ further emphasized that Deel's work as a mechanic, while not substantial gainful activity, additionally suggested that his higher IQ score was more accurate. (R. at 18.)

Faced with this apparent conflict in IQ scores, the state agency ordered a consultative psychological evaluation with additional IQ testing. Psychologist Lanthorn performed intelligence testing on Deel in March 2013, which yielded the following results: verbal comprehension scale index score of 70; perceptual reasoning index score of 71; working memory index score of 71; processing speed index score of 61; and full-scale IQ score of 61. (R. at 603-04.) Lanthorn opined, however, that Deel gave less than full effort on the test and that Deel probably was functioning in the borderline to low average range intellectually. (R. at 604.) In fact, Lanthorn stated that Deel appeared to have responded in a random manner toward the end of the tests.

Thus, the only psychological evidence of valid IQ test scores contained in the record support the ALJ's finding that Deel failed to establish the existence of a valid IQ score between 60 and 70 prior to age 22. For this reason, I conclude that substantial evidence supports the ALJ's finding that Deel's impairments did not satisfy the requirements of § 12.05C.

Case 2:14-cv-00009-PMS   Document 16   Filed 05/06/15   Page 28 of 29   Pageid#: 720

Deel also argues that consultative psychological examination evidence from Lanthorn, which was presented for the first time to the Appeals Council, warrants remand pursuant to sentence six of 42 U.S.C. § 405(g). I find that this argument simply is misplaced. Pursuant to sentence six, "The court … may at any time order additional evidence to be taken before the Commissioner … but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding. …" 42 U.S.C.A. § 405(g) (2014). Here, the records from psychologist Lanthorn's consultative examination of Deel were submitted to the Appeals Council and were incorporated into the record. Therefore, sentence six is inapplicable.

Based on the above reasoning, I conclude that substantial evidence supports the ALJ's finding that Deel's impairments did not satisfy the requirements of § 12.05C. An appropriate order and judgment will be entered.

DATED:     May 6, 2015.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE